Slip Op. 17-7

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| YANTAI CMC BEARING CO. LTD., | |
|       Plaintiff, | |
| v. | Before: Mark A. Barnett, Judge |
| UNITED STATES, | Court No. 16-00011 |
|       Defendant, | **PUBLIC VERSION** |
| THE TIMKEN COMPANY, | |
|       Defendant-Intervenor. | |

OPINION

[The court denies Plaintiff's Motion for Judgment on the Agency Record.]

Dated:  January 30, 2017

Edmund W. Sim, Kelly A. Slater, and Jay Y. Nee, Appleton Luff Pte Ltd., of Washington DC, for plaintiff.

Tara K. Hogan, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With her on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director.  Of Counsel on the brief was Shelby M. Anderson, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

William A. Fennell, Terence P. Stewart and Patrick J. McDonough, Stewart and Stewart, of Washington DC, for defendant-intervenor.

      Barnett, Judge:  In this action Yantai CMC Bearing Co. Ltd. ("Yantai CMC" or "Plaintiff") challenges the final results of the U.S. Department of Commerce ("Commerce") in its administrative review of the antidumping duty order on tapered roller bearings from the People's Republic of China ("PRC" or "China") for the June 1,

2013, to May 31, 2014, period of review ("POR").  *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China,* 81 Fed. Reg. 1,396 (Dep't Commerce Jan. 12, 2016) (final results of the antidumping duty admin. review; 2013-2014) ("Final Results"), Public Joint Appendix ("PJA") Tab 17, ECF No. 39; Public Admin. R. ("PR") 235, ECF No. 21-1, and accompanying *Issues and Decision Mem.*, A-570-601 (Jan. 4, 2016) ("I&D Mem."), PJA Tab 16, PR 227.[1]  Plaintiff argues that Commerce erred by denying Yantai CMC a separate rate and, in the alternative, that Commerce erred in assigning to Yantai CMC an antidumping duty rate based on "adverse facts available" ("AFA").  Mem. of P. & A. in Supp. of Pl. Yantai CMC Bearing Co. Ltd.'s Rule 56.2 Mot. J. on the Agency R. ("Pl.'s Mem.") at 5-15, ECF No. 28; *see also* Rule 56.2 Mot. for J. Upon The Agency on Behalf of Pl. Yantai CMC Bearing Co. Ltd., ECF No. 27.  Defendant responds that Commerce's decision to deny Yantai CMC separate rate status is supported by substantial evidence and that assigning Yantai CMC the countrywide antidumping rate does not constitute an unlawful application of AFA.  *See generally* Confidential Def.'s Resp. to Mot.[ ] for J. Upon the Agency R. ("Def.'s Resp."), ECF No. 30.[2]  For the reasons detailed below, the Court denies Yantai CMC's Motion for Judgment on the Agency Record.

---

[1] Commerce subsequently published a correction to the final results.  *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 81 Fed. Reg. 4,251 (Dep't Commerce Jan. 26, 2016) (correction to final admin. review).  The contents of the correction are not relevant to this litigation.
[2] Defendant-Intervenor also filed a response to Plaintiff's motion.  Confidential Resp. of the Timken Co. to Yantai CMC Bearing Co. Ltd.'s Mem. in Supp. of its Rule 56.2 Mot. for J. on the Agency R., ECF No. 31.

## BACKGROUND

On February 3, 2014, Commerce initiated an administrative review of the antidumping duty order on tapered roller bearings for the June 1, 2013 to May 31, 2014, POR. *Initiation of Antidumping and Countervailing Duty Admin. Reviews*, 79 Fed. Reg. 44,390 (Dep't Commerce July 31, 2014), PJA Tab 1, PR 12. Yantai CMC was selected as a mandatory respondent. Respondent Selection Mem. at 8, PJA Tab 2; PR 19; Confidential Joint Appendix ("CJA") Tab 1, ECF No. 38; Confidential Admin. R. ("CR") 6, ECF No. 21-2.[3]

Commerce preliminarily determined that Yantai CMC had failed to rebut the presumption of government control. *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 80 Fed. Reg. 38,665, 38,666 (Dep't Commerce July 7, 2015) (prelim. results of antidumping duty admin. review), PJA Tab 12, PR 213. Commerce, therefore, assigned Yantai CMC the countrywide rate of 92.84 percent. *Id.* at 38,666. In the final results, Commerce confirmed this finding. Final Results, 81 Fed. Reg. at 1,396-97. In its *Issues & Decision Memorandum*, Commerce explained that Yantai CMC had "demonstrated a lack of *de jure* control" but it "[did] not satisfy the criteria demonstrating an absence of *de facto*

---

[3] Parties filed a public and a confidential joint appendix, *see supra* p. 2 (and the United States filed public and confidential versions of the administrative record, *see id*). All further citations are to documents contained in the confidential joint appendix unless otherwise noted.

government control over export activities."[4]  I&D Mem. at 32-33; *see also* Separate Rate

Analysis for Yantai CMC Bearing Co., Ltd. ("Separate Rate Mem."), CJA Tab 9, CR 452.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930,

as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[5] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial

evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

"Substantial evidence is 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*,

322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S.

197, 229 (1938)).  It '"requires more than a mere scintilla," but "less than the weight of

the evidence."  *Nucor Corp. v. United States*, 34 CIT 70, 72, 675 F. Supp. 2d 1340,

1345 (2010) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)).

The fact that a plaintiff can point to evidence that detracts from the agency's conclusion

or that there is a possibility of drawing two inconsistent conclusions from the evidence

does not preclude the agency's finding from being supported by substantial evidence.

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (citing

---

[4] All parties italicize the terms *de facto* and *de jure* in their pleadings to the court, but the Department of Commerce underlines the terms in its memoranda.  In the interest of consistency the court will italicize the terms, including changing underlining to italics in quotations, where applicable.

[5] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2012 edition, and all references to the United States Code are to the 2012 edition, unless otherwise stated.

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966)).  The court may not

"reweigh the evidence or . . . reconsider questions of fact anew."  *Downhole Pipe &*

*Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015) (quoting *Trent Tube*

*Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir.

1992)); *see also Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267,

1272 (2004) (citation omitted) (the court "may not reweigh the evidence or substitute its

own judgment for that of the agency").

**DISCUSSION**

I.   Legal Framework for Separate Rate Status in Proceedings Involving Non-Market
     Economy Countries

In antidumping duty proceedings involving a country that Commerce considers to

have a nonmarket economy ("NME"), including China, Commerce employs a rebuttable

presumption that all enterprises operating within the NME country are controlled by the

government.  *Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States* ("*Jiangsu*

*Jiasheng II*"), 39 CIT ___, ___, 121 F. Supp. 3d 1263, 1266 (2015); *see also Huaiyin*

*Foreign Trade Corp.,* 322 F.3d at 1372 ("[A]s it has done in previous investigations, the

Department adopted in this proceeding a presumption that the PRC was an [NME]

country pursuant to 19 U.S.C. § 1677(18)(A), requiring companies desiring an

individualized antidumping duty margin to so request and to demonstrate an absence of

state control."); *Sigma Corp. v. United States,* 117 F.3d 1401, 1405 (Fed. Cir. 1997)

(reviewing and affirming Commerce's use of the NME presumption).  Commerce

assigns each exporter of subject merchandise a single countrywide rate, unless the

"exporter can affirmatively demonstrate an absence of government control, both in law (*de jure*) and in fact (*de facto*)" over its export-related activities.  *Jiangsu Jiasheng II*, 39 CIT at ___, 121 F. Supp. 3d at 1266; *see also Sigma Corp.* 117 F.3d at 1405 ("no manufacturer would receive a separate antidumping duty rate unless it could demonstrate that it enjoyed both *de jure* and *de facto* independence from the central government").  The exporter of subject merchandise bears the burden of showing it is autonomous of government control.  *AMS Assoc., Inc. v. United States*, 719 F.3d 1376, 1379-80 (Fed. Cir. 2013); *see also Sigma Corp.*, 117 F.3d at 1405-06 (Commerce's decision to place burden on exporters is justified because exporters have best access to information) (citing *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993)).

        To establish whether an exporter is eligible for a separate rate, Commerce applies a test it first set forth in *Final Determination of Sales at Less Than Fair Value: Sparklers from the People's Republic of China*, 56 Fed. Reg. 20,588, 20,589 (Dep't Commerce May 6, 1991), and modified in *Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China*, 59 Fed. Reg. 22,585, 22,586-87 (Dep't Commerce May 2, 1994); *see also* Policy Bulletin on the Topic of Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries (April 5, 2005) ("Policy Bulletin 05.1") at 1-2, available at http://enforcement.trade.gov/policy/bull05-1.pdf (last visited

January 23, 2017) (restating the *de jure* and *de facto* criteria).  Only Commerce's finding

pursuant to the *de facto* test is challenged here.[6]

To determine whether an exporter is free of *de facto* government control,

Commerce considers four factors: (i) whether export prices are set by or subject to the

approval of a governmental authority; (ii) whether the exporter has authority to negotiate

and sign contracts and other agreements; (iii) whether the exporter has autonomy from

the government in making decisions regarding the selection of its management; and (iv)

whether the exporter retains the proceeds of its export sales and makes independent

decisions regarding the disposition of profits or financing of losses.  *See* Policy Bulletin

05.1 at 2; *see also Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States*

("*Jiangsu Jiasheng I*")*,* 38 CIT ___,___, 28 F. Supp. 3d 1317, 1349 (2014).

II.   Commerce's Finding that Yantai Did Not Rebut the Presumption of State Control
      is Supported by Substantial Evidence

The court will uphold a Commerce determination provided it is based on

substantial evidence.  19 U.S.C. § 1516a(b)(1)(B)(i).  Plaintiff argues that Commerce's

denial of separate rate status ignored record evidence of Yantai CMC's autonomy from

Chinese government control and that Commerce, in effect, applied an irrebuttable

presumption of control when it focused on the potential for control resulting from an

ownership interest in the exporter.  Pl.'s Mem. at 8-13.  Defendant responds that

Commerce's determination is supported by substantial evidence in the record and

---

[6] Commerce found that Yantai CMC successfully demonstrated an absence of *de jure*
government control.  *See* Pl.'s Mem. at 6.

constituted a proper application of the *de facto* test.  Def.'s Resp. at 8-17.  For the

reasons detailed below, the court sustains Commerce's determination.

Commerce applies a rebuttable presumption of state control to exporters from a

nonmarket economy country, such as China.  *Jiangsu Jiasheng II*, 39 CIT at ___, 121 F.

Supp. 3d at 1266; *see also Huaiyin Foreign Trade Corp.,* 322 F.3d at 1372.  The burden

of showing autonomy from government control lies with the exporter, in this case, Yantai

CMC.  *AMS Assoc.,* 719 F.3d at 1379; *see also Sigma Corp.* 117 F.3d at 1405-06

(citations omitted).  In the underlying administrative proceeding, Commerce reviewed

record evidence and made a determination that Yantai CMC did not demonstrate an

absence of *de facto* control by the Chinese government.  I&D Mem. at 32-33; *see also*

Separate Rate Mem. at 4-5.  This determination was based upon Yantai CMC's

ownership chain, which extended from the Chinese government to Yantai CMC.  I&D

Mem. at 32-33; *see also* Separate Rate Mem. at 4-5.  Specifically, Commerce reviewed

questionnaire responses and articles of association from Genertec, which owned China

National Machinery Import & Export Corporation ("CMC"), which, in turn, owned Yantai

CMC with Paryocean Company Limited ("Paryocean").  *See* I&D Mem. at 32-33 and nn.

133-138; Separate Rate Mem. at 4-5 and nn. 13-21.[7]

---

[7] While aspects of this ownership chain were treated as business proprietary during the
administrative proceeding, Plaintiff made this information public in its moving brief.  See
Pl.'s Mem. at 9, n. 19.

Commerce determined that the Yantai CMC chain of ownership extended to the Chinese government because Yantai CMC is more than majority owned by CMC,[8] which is, in turn, more than majority owned by Genertec, and Genertec is wholly-owned by the State-owned Assets Supervision and Administration of the State Council ("SASAC").  Separate Rate Mem. at 4; I&D Mem. at 32; s*ee also* Yantai CMC Section A Questionnaire Resp. (Sept. 25, 2014) ("Yantai CMC Section A Resp.") at 2-4, CJA Tab 2, CR 8 ; Yantai CMC Suppl. Sections A & C Resp. (Apr. 16, 2015) ("Yantai CMC Suppl. Sections A & C Resp. I") at 5-6, CJA Tab 4, CR 313 .  Commerce examined this information and concluded that, "as a result, Yantai CMC is indirectly [majority] owned by SASAC."  Separate Rate Mem. at 4.  Plaintiff does not contest any of these factual findings by Commerce that Yantai CMC's chain of ownership extended to the Chinese government.  *See generally* Pl.'s Mem.; *see also* I&D Mem. at 33 and n. 139.

Having established this chain of indirect ownership, Commerce noted that it "would expect any majority shareholder, including a government, to have the ability to control . . . the operations of the company" and that "[t]he record in this case supports that expectation."  Separate Rate Mem. at 4; *see also* I&D Mem. at 32.  Commerce based this finding on its review of the articles of association for Yantai CMC, CMC, and Genertec, as well as the record evidence showing SASAC's exercise of authority via the chain of control.  *See generally* I&D Mem. at 32-33; Separate Rate Mem. at 4-5 and nn. 16-21; Def.'s Resp. at 10-12.  Specifically, Commerce reviewed Genertec's articles of

---

[8] CMC owns [[  ]] percent while Paryocean owns the remaining [[  ]] percent.  Separate Rate Mem. at 4.

association, which provide SASAC with the ability to appoint Genertec's directors, and the record, which showed SASAC exercised this authority.  I&D Mem. at 32 and n. 133; Separate Rate Mem. at 4 and n. 16; *see also* Yantai CMC Second Suppl. Section A Resp. (May 28, 2015), CJA Tab 6, CR 434, Ex. 2 ("[Genertec] Articles of Assoc.") (showing relationship between Genertec and SASAC) and Ex. 3 ("Notice of Appointment [Genertec]") (showing the appointment of four directors).  Commerce then noted that Genertec "has the ability to appoint all board members of its wholly-owned PRC company ([CMC])," I&D Mem. at 32 and n. 134;[9] *see* Separate Rate Mem. at 4-5 and n. 17.

Further, as the majority owner of Yantai CMC, CMC has the authority to appoint the majority of Yantai CMC's board.[10]  I&D Mem. at 32 and n. 135; Separate Rate Mem. at 4 n. 18; Yantai CMC Suppl. Sections A & C Resp. (Apr. 16, 2015) ("Yantai CMC Suppl. Sections A & C Resp. II"), Ex. S-8 ("Yantai CMC Articles of Assoc."), CJA Tab 5, CR 314.[11]  CMC's board of directors also have the power to nominate Yantai CMC's general manager (for approval by Yantai CMC's board) and to appoint its general

---

[9] Citing Yantai CMC Suppl. Sections A & C Resp. II, Ex. S-7 ("[CMC] Articles of Assoc."), CJA Tab 5, CR 314, (describing the board as its [[                    ]]).
[10] Specifically, CMC has the authority to appoint [[    ]] of [[      ]] board members for Yantai CMC.  Yantai CMC Articles of Assoc.
[11] Defendant noted that the record shows "CMC exercised this authority on several occasions."  Def.'s Resp. at 11 (citing Yantai CMC Second Suppl. Section A Resp. (May 28, 2015), Ex. 8 ("Notice of Appointment Yantai CMC"), CJA Tab 7, CR 435).  While the agency did not expressly rely on these particular facts in making its determination, the path of the agency's reasoning is sufficiently clear for the court to reference them. *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) (per curiam).

management.  I&D Mem. at 32 and nn. 136, 137; Separate Rate Mem. at 5 n. 19, 20;
*see also* Yantai CMC Articles of Assoc.  In its review of the record documents,
Commerce found instances of overlap in officials at companies within the Yantai CMC
chain of ownership.  I&D Mem. at 33; Separate Rate Mem. at 5.  A member of CMC's
board of directors and its Deputy General Manager, is also a Deputy General Manager
at Genertec.[12]  I&D Mem. at 33; Separate Rate Mem. at 5 and n. 21; *see also* Yantai
CMC Section A Resp. at 2, Yantai CMC Suppl. Sections A & C Resp. I at 6.  In addition,
the chairman of Yantai CMC's board is also a vice president at CMC.[13]  Separate Rate
Mem. at 5 and n. 21; *see also* Yantai CMC Section A Resp. at 8; Yantai CMC Suppl.
Sections A & C Resp. I at 8.

       Based upon its review of these facts, Commerce determined that "Yantai CMC
has not demonstrated an absence of *de facto* control" and that "evidence demonstrates
that, via SASAC, the PRC government exercises its rights inherent in majority
ownership, as expected."  Separate Rate Mem. at 4.  Yantai CMC does not appear to
contest Commerce's factual findings as to its chain of ownership and the line of control
extending through its corporate structure, except to assert that it is "extremely
attenuated, based on four degrees of separation at the corporate entity level between
SASAC and Yantai CMC."  Pl.'s Mem. at 9.  Plaintiff claims that Commerce's
determination was not based on substantial evidence in the record, *see* Pl.'s Mem. at 7-
13, but, in fact, Plaintiff seeks to have the court reweigh the evidence.

---

[12] This official is named [[          ]]
[13] This official is [[        ]]

Plaintiff asserts that Commerce "ignored" evidence that "none of [Yantai CMC's] managers or board members . . . had any relationships with any level of the PRC government" and that the record contained "[no] [sic] evidence showing that the POR managers and board members . . . disregarded the normal corporate governance structure or interfered with the day-to-day operations of Yantai CMC." Pl.'s Mem. at 7. As proof of this, Plaintiff cites to statements it made in its questionnaire responses. *Id*. (citing to *see also* Yantai CMC Section A Resp. at 8; Yantai CMC Suppl. Section A & C Resp. I at 13). Similarly, Plaintiff claims that "Commerce ignored documentation demonstrating that Yantai CMC's management team is selected by its board of directors" and the company is not obligated to submit its "candidates for managerial positions . . . for approval to any government entity." Pl.'s Mem. at 8. Again, Plaintiff cites to statements made in its questionnaire responses. *Id.* (citing to Yantai CMC Section A Resp. at 8; Yantai CMC Suppl. Section A & C Resp. I at 13).

Commerce's role in an administrative proceeding is to weigh the evidence established in the record. *See Camau Frozen Seafood Processing Import Export Corp. v. United States*, 38 CIT ___,____, 968 F. Supp. 2d. 1328, 1337 (2014). It is the respondent's burden to create the record. *See Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002) (respondent has burden to create an accurate record); *Zenith Elecs. Corp.,* 988 F.2d at 1583 ("The burden of production [belongs] to the party in possession of the necessary information."). In the instant proceeding, Commerce determined to give more weight to record evidence such as the chain of ownership from Yantai CMC to SASAC and the articles of association and

letters showing appointment of directors and officers than to claims made by the

respondent that were not similarly supported by the record.  Commerce weighed the

evidence and arrived at a conclusion that, while not to Plaintiff's liking, is supported by

substantial evidence on the record.  It is not the court's role to reweigh that evidence.

*Matsushita Elec.*, 750 F.2d at 933.

     Plaintiff claims that "there was no record evidence" that "Yantai CMC's board's

overseeing of the company's management, as part of its normal obligations to the

company in any way translated into any interference with the company's daily

operations, let alone export activities."  Pl.'s Mem. at 8.  Plaintiff appears to

misunderstand its burden.  Plaintiff's assertion fails to demonstrate "autonomy from the

central, provincial and local governments in making decisions regarding the selection of

management."  Policy Bulletin 05.1 at 2.  Instead, it challenges Commerce's finding on

the basis that the agency failed to consider evidence that was not placed on the record

by Yantai CMC.  As the exporter in an NME country and an entity that is indirectly

majority-owned by SASAC, Yantai CMC had the burden to bring forth evidence

establishing its autonomy from government control to rebut the presumption of state

control.  Because Yantai CMC failed to produce such evidence, Commerce reasonably

found that the presumption of state control was not rebutted.

     Plaintiff argues that Commerce erred in its *de facto* analysis by "focus[ing] on

majority government ownership to the exclusion of all other traditional *de facto* factors"

and that Commerce's "reli[ance] upon the notion of a theoretical 'potential' for Chinese

government control . . . [was] problematic from a basic evidentiary perspective" because

there was "no record evidence . . .  that there was any involvement of the shareholders

of Yantai CMC in its export activities."  Pl.'s Mem. at 9-10.  According to Yantai CMC,

this amounts to an "irrebuttable presumption" because "no information or argument

regarding the other *de facto* criteria would be sufficient to overcome this theoretical,

'potential' government control" regardless of how remote the ownership interest might

be.  *Id*. at 10.  Defendant responds that Yantai CMC "do[es] not demonstrate any error

in Commerce's analysis," that Commerce is "entitled to presume that the Chinese

government controls Yantai CMC," and that Yantai CMC has the burden to rebut the

presumption.  Def.'s Resp. at 9, 16-17 (emphasis omitted).  Yantai CMC's arguments

are unavailing.

Plaintiff misunderstands the interplay between the presumption of government

control and the four factor *de facto* test.  Commerce applies a presumption of

government control for entities operating within an NME and permits the respondent to

rebut this presumption by satisfying the *de jure* and *de facto* tests.  The prong of the *de*

*facto* test at issue in this case involves whether the exporter or respondent "has

autonomy from the . . . government[ ] in making decisions regarding the selection of its

management."  Policy Bulletin 05.1 at 2.  Yantai CMC placed documents on the record

explaining the corporate ownership structure and relationship between SASAC,

Genertec, CMC, and Yantai CMC. *See supra* pp. 9-11.  Commerce reviewed this

documentation and concluded that Yantai CMC did not have autonomy from the

Chinese government as a result of this chain of ownership through which SASAC was

an indirect majority owner of Yantai CMC.  That Commerce considered this to be

dispositive in the instant case does not mean that the agency misapplied the

presumption or made it irrebuttable.  That particular facts (majority ownership) may be

sufficient to support an agency determination of control, and the existence of those facts

in this particular case (*i.e.*, indirect majority control by SASAC), does not alter the test

into an irrebuttable presumption; instead, it means that, on the basis of these facts,

Plaintiff failed to rebut the presumption. Moreover, Yantai CMC's references to

"theoretical, 'potential' government control" are belied by evidence in the record.

Commerce also found actual exercise of control through the appointment of officials and

the overlap in management between the companies.  Separate Rate Mem. at 4-5.

Accordingly, the court sees no reason to disturb Commerce's finding.

        As noted above, Commerce requires that exporters satisfy all four factors of the

*de facto* control test in order to qualify for separate rate status.  *See Advanced Tech. &*

*Materials Co. v. United States*, 37 CIT ___,___, 938 F. Supp. 2d 1342, 1349 (2013),

*aff'd without op.*, 581 F. App'x 900 (Fed. Cir. 2014) (quoting Commerce's second

remand determination "*each* of the *de facto* prongs must be satisfied for a company to

get a separate rate"); *see also* Policy Bulletin 05.1 at 2.  Specifically, the third factor

asks "whether the respondent has autonomy from the . . . government[ ] in making

decisions regarding the selection of management."  Policy Bulletin 05.1 at 2.  As an

exporter in an NME country that is indirectly majority-owned by the government, Yantai

CMC has the burden to show that it has such autonomy.  *Sigma Corp.*, 117 F.3d at

1406.  Yantai CMC failed to meet the third factor of the test.  Given that all four factors

must be satisfied, Commerce had no further obligation to continue with the analysis.

III.    Commerce's Decision to Assign Yantai the Countrywide Rate is in Accordance
        with Law

Plaintiff argues that "Commerce effectively assigned an [AFA] rate to Yantai

CMC because it was denied separate rate status" when the countrywide rate was

"based on AFA during the 2006-2007 administrative review."  Pl.'s Mem. at 13.  Plaintiff

contends this was unlawful because Yantai CMC cooperated to the best of its ability in

the instant proceeding.  Pl.'s Mem. at 13-15.  Defendant responds that "Commerce [did

not] rely upon facts available, or [AFA], in determining a rate for Yantai CMC.  Rather,

Commerce found that Yantai CMC failed to meet its burden of rebutting the presumption

of government control, and that as a result, Yantai CMC was found to be part of the

China-wide entity, and subject to the [countrywide] rate."  Def.'s Resp. at 18.  The court

agrees.

The use of AFA and the need to establish facts to obtain a separate rate are

distinct concepts.  *Advanced Tech.*, 31 CIT at ___, 938 F. Supp. 2d at 1351; *Watanabe

Group v. United States*, 34 CIT 1545, 1551 n. 8 (2010) ("These are two distinct legal

concepts: a separate AFA rate applies to a respondent who has received a separate

rate but has otherwise failed to cooperate fully whereas the [countrywide] rate applies to

a respondent who has not received a separate rate").  As discussed above, in

antidumping proceedings involving NME countries, Commerce presumes that all entities

operating within the country are subject to government control.  Those entities "desiring

an individualized antidumping duty margin" must request a separate rate and show they

operate autonomously from government control.  *Huaiyin Foreign Trade Corp.* 322 F.3d

at 1372; *see also Jiangsu Jiasheng II*, 39 CIT at ___, 121 F. Supp. 3d at 1266.  When

an exporter is able to show autonomy from state control, Commerce assigns it a

separate rate.  *See Sigma Corp.,* 117 F.3d at 1405-07.  However, when an exporter is

unable to "affirmatively demonstrate an absence of government control," Commerce

assigns it the single countrywide rate.  *Jiangsu Jiasheng II*, 39 CIT at ___, 121 F. Supp.

3d at 1266.  In the present case, Yantai CMC failed to demonstrate autonomy from

state control and was assigned the countrywide rate.  The fact that the countrywide rate

in this instance stemmed from an earlier application of AFA does not mean that

Commerce must meet the statutory requirements for applying AFA to Yantai CMC in

this review; Yantai CMC simply receives the countrywide rate currently in effect as the

result of its failure to qualify for a separate rate.

     Yantai CMC made this argument during the administrative proceeding and

Commerce rejected it, noting that the Court of International Trade "addressed and

rejected a similar argument" in *Advanced Tech.*  I&D Mem. at 34 ("a separate AFA rate

applies to a respondent who has received a separate rate but has otherwise failed to

cooperate to the best of its ability whereas the countrywide rate applies to a respondent

who has not received a separate rate").  Plaintiff offers the court nothing new in support

of its argument.  This court agrees that Commerce assigned Yantai CMC the separate

rate because it failed to rebut the presumption of government control.  The court,

therefore, sustains Commerce's determination as in accordance with law.

## CONCLUSION

Based on the foregoing, the court denies Plaintiff's motion for judgment on the

agency record.  Judgment will issue separately.

/s/      Mark A. Barnett____
Mark A. Barnett, Judge

Dated: <u>January 30, 2017_____</u>
            New York, New York